IN THE CIRCUIT COURT OF THE
6TH JUDICIAL CIRCUIT IN AND FOR
PINELLAS COUNTY, FLORIDA

CASE NO. 04007672CI-19

QUALITY RESOURCES, INC.
a Florida corporation

Florida Bar No. 229091

        Plaintiff,

vs.

SIGNATURE AGENCY, INC.,
a General Electric financial company,

        Defendant.

_____/

RECEIVED
CIVIL COURT RECORDS

OCT 27 2004

KARLEEN F. De BLAKER
CLERK CIRCUIT COURT
PINELLAS COUNTY

## COMPLAINT

    Plaintiff, Quality Resources, Inc., sues Defendant, Signature Agency, Inc., a General

Electric financial company, for breach of contract, breach of the implied covenant of good faith

and fair dealing, and breach of fiduciary duty, and as grounds states the following:

### JURISDICTIONAL ALLEGATIONS

    1.    This is an action for damages in excess of $15,000, exclusive of interest, costs and

fees, and is, therefore, within the jurisdictional limits of this Court.

    2.    Venue is proper in Pinellas County, Florida because the events that give rise to

this lawsuit occurred in Pinellas County, Florida.

    3.    Plaintiff, Quality Resources, Inc. ("Quality"), is a corporation duly organized and

existing under the laws of the State of Florida.

    4.    Defendant, Signature Agency, Inc., a General Electric financial company

("Signature"), is a foreign corporation licensed to do business in the State of Florida.

Quality Resources, Inc. v.
Signature Agency, Inc., a
General Electric Financial Company

## GENERAL ALLEGATIONS

5. Quality, in addition to performing other functions, offers direct marketing services, including telemarketing services, to business seeking to market products.

6. Signature, among other things, offers for sale Entertainment Club memberships which affords members discounts on various entertainment options.

7. On January 15, 2003, Quality and Signature entered into a Marketing Agreement ("the Contract"), in which the parties agreed that Quality would provide marketing services for Signature's products, including the Entertainment Club memberships. A true and correct copy of the Contract is attached hereto and incorporated by reference herein as Exhibit "A."

8. The term of the Contract was for one year.

9. Section 12.1 of the Contract provides, among other things, that the Contract will automatically renew for subsequent periods of one year each, unless the Contract is terminated pursuant to the Agreement.

10. The Contract was not terminated at the end of the first year, or January 15, 2004, and was automatically renewed for a new one-year term extending from January 15, 2004 through January 14, 2005.

11. On October, 15, 2004, Signature verbally terminated the Contract, effective immediately, and did not provide any notice of the termination.

12. Section 12 of the Contract sets forth the specific circumstances when a party may terminate the contract, with or without notice.

2

Quality Resources, Inc. v.
Signature Agency, Inc., a
General Electric Financial Company

13.    None of the circumstances that allow for termination without notice outlined in

Section 12 were present on October 15, 2004 when Signature terminated the Contract.

14.    Signature's October 15, 2004 termination of the Contract without notice

constitutes termination of the Contract without justification under the Contract and, thus, without

legal cause.

15.    Signature owes Quality compensation under the Contract that has been earned but

not paid as required by Section 10 of the Contract.

16.    Quality has retained the undersigned law firm to represent it in this action and is

obligated to pay them a reasonable fee for their services.

17.    All conditions precedent to the filing and maintaining of this action have either

been performed, waived or otherwise excused.

COUNT I
(Breach of Contract)

18.    Plaintiff realleges and reavers the allegations set forth in paragraphs 1 through 17

above as though fully set forth herein.

19     Quality and Signature are parties to the Contract attached hereto as Exhibit A.

20.    Signature breached the Contract by:  (1) terminating the Contract on October 15,

2004 without cause; and (2) failing to pay Quality all compensation due under the Contract.

21.    As a natural and probable consequence of the breach of contract, Quality has been

damaged.

3

Quality Resources, Inc. v.,
Signature Agency, Inc., a
General Electric Financial Company

**WHEREFORE**, Quality demands judgment against Signature for compensatory damages, prejudgment interest, court costs and attorneys' fees pursuant to the Contract, and such other and further relief as this Court deems just and proper.

## COUNT II
(Breach of Implied Covenant of Good Faith and Fair Dealing)

22.     Plaintiff realleges and reavers the allegations set forth in paragraphs 1 through 17 above as though fully set forth herein.

23.     Signature had an implicit obligation under the Contract to act in Quality's best interests and to avoid self-dealing and conflicts of interest.

24.     Signature's termination of the Contract constitutes a breach of its implied covenant of good faith and fair dealing.

25.     As proximate cause of the breach of the implied covenant of good faith and fair dealing, Quality has been damaged

**WHEREFORE**, Quality demands judgment against Signature for compensatory damages, prejudgment interest, court costs, and such other and further relief as this Court deems just and proper.

## COUNT III
(Breach of Fiduciary Duty)

26.     Plaintiff realleges and reavers the allegations set forth in paragraphs 1 through 17 above as though fully set forth herein.

27.     Signature had a fiduciary duty to conduct itself as agent in utmost good faith with loyalty and honesty to Quality.

4

Quality Resources, Inc. v.
Signature Agency, Inc., a
General Electric Financial Company

28. Signature breached its fiduciary duty by when it terminated the Contract.

29. Signature's conduct was willful, wanton and malicious. Quality reserves the right to seek leave to amend so as to allege entitlement to punitive damages.

30. As proximate cause of the breach of fiduciary duty, Quality has been damaged.

**WHEREFORE**, Quality demands judgment against Signature for compensatory damages, punitive damages (if permitted by the Court), prejudgment interest, court costs, and such other and further relief as this Court deems just and proper.

GREENSPOON, MARDER, HIRSCHFELD,
RAFKIN, ROSS & BERGER, P.A.
Attorneys for Plaintiff
100 W. Cypress Creek Road, Suite 700
Fort Lauderdale, Florida 33309
954.491.1120 (Telephone)
954.343.6956 (Facsimile)

BY: _____

RICHARD W. EPSTEIN
Florida Bar No:
KEVIN E. VANCE
Florida Bar No. 0670464

G:\KevinV\8137\0013\pldgs\Complaint.DOC

5

## Quality Resources, Inc.
## MARKETING AGREEMENT

THIS AGREEMENT is entered into as of __January 15__, 2003 ("Effective Date"), by and between Quality Resources, Inc. ("PARTNER"), with its principal offices at 28870 U. S. 19 North, Suite 200, Clearwater, FL 33761, and Signature Agency, Inc. ("COMPANY") a GE Financial company with its principal offices at 200 North Martingale Road, Schaumburg, Illinois 60173-2096.

### RECITALS

COMPANY owns and operates several club and other businesses, several of which are identified on the Product Exhibits attached to and incorporated into this Agreement, that it offers to the general public; and

PARTNER owns and operates a direct marketing business through which it markets its own products; and

COMPANY and PARTNER wish to promote the Products to Customers, subject to the terms of this Agreement.

THEREFORE, in consideration of the promises contained in this Agreement, which the parties acknowledge to be sufficient, COMPANY and PARTNER agree as follows:

### TERMS

Section 1. **Definitions.** Each of the following terms will have the meaning ascribed to it in this Section wherever they appear in this Agreement:

1.1    "Claim" means any action, cause of action, suit, claim, demand, settlement, judgment, controversy, loss, obligation, damage, cost, liability, lien, fine, penalty, charge, court cost, reasonable attorneys fees and expenses, payment, liability and expense, asserted against, imposed upon, or incurred or suffered by an Indemnitee.

1.2    "COMPANY" means the entity or entities identified in the preamble to this Agreement, above; provided, however, that each such entity is entitled to the rights and liable for the obligations attributed to "Company" in this Agreement only to the extent relevant to the Product(s) for which it is responsible, as reflected in the Product Exhibits.

1.3    "Confidential Information" means any data and information relating to the disclosing party's business or matters relating to this Agreement which the disclosing considers to be confidential, including, but not limited to, methods of operation, advertising materials, marketing concepts, customer or member names and other identifying information, and other proprietary information, whether or not such information is expressly marked as confidential and in whatever form it



is disclosed. Confidential Information does not include any information which the receiving party can demonstrate:

1.3.1 is or becomes available to the public other than by a breach of this Agreement; or

1.3.2 was previously known to the receiving party without any obligation to hold it in confidence; or

1.3.3 was received from a third party free to disclose such information without restriction; or

1.3.4 is or was independently developed by the receiving party without the use of the other party's Confidential Information; or

1.3.5 the other party has consented in writing to disclosure of such information, but only to the extent of such consent.

1.4 "Customer" means the customers of PARTNER to which Products are to be marketed.

1.5 "Effective Date" means the date identified in the preamble to this Agreement, above.

1.6 "Indemnitee" means any person entitled to indemnification under this Agreement, including the non-indemnifying party, its parent and affiliated entities, and each of their officers, directors, employees, agents, and representatives.

1.7 "Indemnitor" means each indemnifying party when such party is obligated to defend an Indemnitee under this Agreement.

1.8 "Marketing Plan" means a plan developed by the parties for marketing of the Products which shall include, but not be limited to, such items as the goals for promotion of the Products during the quarter, the nature and timing of promotion of the Products, the specific Products or benefits to be promoted, the identity and number of Customers to whom and the Clients through which the promotions will be directed, and other aspects of the promotion of the Products to Customers not expressly addressed in this Agreement.

1.9 "Membership Report" means a report which states the number of Customers who have enrolled in each of the Products during the previous month and paid the Membership Fee, the number of Customers who have terminated enrollment in each of the Products during the previous month, and any other information to which the parties agree in writing in advance.

1.10 "Membership Fee" means a fee paid by Customers for a Product in which the Customer has enrolled as delineated for each Product in the applicable Product Exhibit.

1.11　"PARTNER" means the entity identified in the preamble to this Agreement above.

1.12　"Product(s)" means the products and services identified on the Product Exhibits to this Agreement, which the parties intend to promote to Customers under the terms delineated in this Agreement.

1.13　"Product Exhibit(s)" means the attachments to this Agreement in which the Products are described and other terms relating specifically to the Products are stated, as described below.

1.14　"Production Period" means in each case either (i) the 1st through the 14th of the month, or (ii) the 15th through the end of the month.

Section 2. Products. The nature of and benefits offered through the Products are as described in the Product Exhibits and other materials COMPANY creates for that purpose, as they may change from time to time. COMPANY may change the benefits of the Products at its discretion with prior notice to PARTNER.

Section 3. Promotion of the Products. PARTNER will promote the Products to Customers as follows:

3.1　COMPANY and PARTNER will negotiate in good faith to develop a Marketing Plan for each quarter during the term of this Agreement, to be completed as soon after the execution of this Agreement as reasonably practicable and not less than forty five (45) days prior to the beginning of each quarter thereafter. PARTNER will, at its own expense, conduct outbound "upsell" telemarketing of Products to Customers according to the agreed to Marketing Plan.

3.2　COMPANY shall have the right to review: a) all of PARTNER's offers involving marketing calls with which Products are offered, and b) how the Products are positioned in the overall script. PARTNER will promote the Products only to Customers of its own product, as structured at the time of execution of this Agreement, or to which COMPANY has otherwise consented in writing in advance. Should PARTNER market an additional product of its own, or another company's product or service, COMPANY may, in its sole discretion, decline to have a Product offered in connection with a particular company, another company's product or PARTNER'S new product. PARTNER will not promote the Products in conjunction with the promotion of any other program that provides services or benefits similar to or competitive with the Products in the same call.

3.3　PARTNER will use only telemarketing scripts and any other promotional material COMPANY provides to promote the Products under this Agreement and will not publish, broadcast or distribute any promotional material in which either COMPANY or any of the Products is referred and, once approved, will not revise any such material, without COMPANY's express prior written consent and approval.

3.4     For the promotions contemplated under this Agreement, PARTNER will use only telemarketing service representatives appropriately qualified and trained according to COMPANY's reasonable standards and will otherwise conduct the promotions according to COMPANY's standards and policies for such promotions. COMPANY shall provide to PARTNER, and COMPANY and PARTNER shall mutually agree upon, the compliance standards applicable to each marketing campaign at the beginning of the campaign.

3.5     PARTNER will record all calls, whether outbound or inbound, in which it presented a promotion for any of the Products and will maintain all such recordings according to COMPANY's standards for storage and retrieval of such materials. In addition to, and not at the exclusion of, the compliance standards developed for each campaign, PARTNER shall maintain, or cause to be maintained, all recordings of sales of the Products for storage and retrieval, according to standards to which the parties agree in advance in writing, for a minimum of two (2) years at no cost to COMPANY. PARTNER shall thereafter provide COMPANY with the option of having the recordings transferred to the location of COMPANY's choosing, and in such case, PARTNER shall ensure that COMPANY is also provided with the appropriate retrieval system to ensure COMPANY has the ability to timely locate specific recordings. PARTNER will recall from storage, or such other location where tapes are maintained, any tape of the Product enrollment and will provide the requested tape to COMPANY within forty-eight (48) hours of PARTNER's receipt of COMPANY's request.

3.6     PARTNER will provide all necessary systems for COMPANY to conduct remote monitoring of calls conducted under this Agreement according to COMPANY's standards for such monitoring.

3.7     PARTNER will, with appropriately qualified and trained personnel, verify each completed transaction by a review of the recording of the call in which a Customer purported to enroll in any of the Products to assure that the Customer's enrollment is knowing, voluntary and otherwise valid according to COMPANY's standards for sales verification.

3.8     PARTNER shall immediately inform COMPANY of any regulatory inquiry or investigation of an activity of PARTNER or its telemarketers of which COMPANY or any Product offer is a part.

Section 4. License. Subject to the terms and conditions of this Agreement, COMPANY hereby grants to PARTNER a non-exclusive, non-transferable, personal limited right and license to use as permitted in this Agreement any trademarks, service marks, trade names, logos, and other identifiers related to the Products (collectively, the "COMPANY Marks") for the sole purpose of the promotion of the Products as contemplated in this Agreement. COMPANY will retain all right, title and interest in and to the COMPANY Marks worldwide, subject to the limited license granted to PARTNER in this Agreement.

## Section 5. Product Administration.

5.1    For all Customers who elect to enroll in any of the Products, PARTNER will obtain and provide to COMPANY all personal identifying information reasonably necessary for COMPANY to enroll Customers in, obtain payment for membership in and operate the Products, including, but not limited to, the Customer's name, address, phone number, and credit card account number to which the Customer's Membership Fees are to be charged.

5.2    COMPANY will accept eligible Customers for enrollment in the Products according to its standard enrollment policies and procedures for the Products. Notwithstanding anything in this Agreement to the contrary, COMPANY, in its sole discretion, may reject or terminate any Customer's application for enrollment in the Products according to its standard policies, practices and procedures for each Product. Except as otherwise provided in this Agreement, COMPANY will be solely responsible for administration of the Products, including maintaining agreements with participating providers, as appropriate, processing applications for and enrollment of Customers in the Products, preparing and distributing membership information to Customers enrolled in the Products, and responding to inquiries from Customers regarding the Products.

## Section 6. Reports.

6.1    During the term of this Agreement, COMPANY will prepare and provide to PARTNER by the end of each month a Membership Report in COMPANY's standard electronic format of data.

6.2    PARTNER will prepare and provide to COMPANY, on a schedule and in a format to which the parties agree in advance in writing, a report showing:

6.2.1    all information it obtains for enrollment of Customers who elect to enroll in the Products, as delineated in Section 4(a), above;

6.2.2    the number of calls received in which a promotion of the Products was offered and delivered; and

6.2.3    any other information to which the parties agree in writing in advance.

Section 7. Membership Fees. COMPANY may charge and will bill and collect from each Customer enrolled in the Products a Membership Fee according to its standard policies and procedures for each of the Products. COMPANY may change any Membership Fee at its discretion, subject to the Product membership agreement and applicable laws and regulations.

Section 8. Customer Information. Notwithstanding anything in this Agreement or otherwise to the contrary, all information PARTNER obtains from a Customer related to such Customer's relationship with PARTNER and thereafter provides to COMPANY to enroll Customers in the Product(s) is and will remain COMPANY'S and PARTNER'S joint proprietary information free from any restriction whatsoever on COMPANY'S or

PARTNER'S use, other than restrictions imposed by applicable laws and regulations and restrictions imposed by the Customer. To the extent PARTNER obtains and provides to COMPANY unique information for enrollment in the Product(s), (e.g. spouse's name) PARTNER will not use any such additional information for any purpose whatsoever, except as necessary to carry out its obligations under this Agreement, without COMPANY's express prior written consent and approval.

Section 9. **Customer Service.**  COMPANY will provide all customer service and other administrative functions relating to the Products and will respond to all contacts from governmental or other regulatory bodies regarding the Products.  COMPANY will maintain a customer service phone line accessible from locations within the United States to receive Customers' inquiries regarding the Products.  PARTNER will refer any inquiries it receives from Customers or any other source regarding the operation of the Products to COMPANY promptly upon receipt, and will not attempt to resolve such inquiries without COMPANY's prior written consent and approval.

Section 10.   Compensation.

10.1    As compensation for PARTNER's services under this Agreement, COMPANY will pay to PARTNER throughout the term of this Agreement the fee or fees delineated in the Product Exhibit for such Product attached to and incorporated into this Agreement as an Exhibit A.

10.2    With each Initial Compensation Report, COMPANY will pay PARTNER all compensation to which PARTNER is entitled, as reflected in the Initial Compensation Report.  COMPANY will pay the appropriate fee within the period set forth in the Product Exhibit for such Product.  Notwithstanding the above, COMPANY may hold back up to twenty percent (20%) of the compensation ("Withholding Fund") until the time of the True-Up Compensation Report for the applicable Production Period.

10.3    A fee shall only be payable for an enrollment for which all necessary information required to be provided by PARTNER as set forth in this Agreement and detailed in the True-Up Compensation Report has been provided and COMPANY can successfully bill the first month's or annual membership fee.

10.4    COMPANY will maintain records of initial enrollments, rejects, errors, pre-bill cancels and net enrollments in the Product(s) by Customers.  Within seventy five (75) days after the close of each Production Period, COMPANY will provide to PARTNER reports, including the True-Up Compensation Report, of such information in a format to which the Parties agree in advance in accordance with the true-up process set forth in Exhibit A.  If the True-Up Compensation Report indicates that the Withholding Fund for the Production Period exceeded the payment adjustment, COMPANY shall pay PARTNER the remaining balance of the Withholding Fund for that Production Period.  If the True-Up Compensation Report indicates that the Withholding Fund for the Production Period was less than the payment adjustment, COMPANY may either withhold the remaining balance from the next compensation payment or may require PARTNER to reimburse the remaining balance.  If the True-Up Compensation Report indicates

a payment adjustment is due from PARTNER, COMPANY may increase the percentage used for the Withholding Fund for future Production Periods by the difference in the percentage of such payment adjustment to the original compensation payment and the original twenty percent (20%) limit.

10.5    After the fee is paid for a Product member, no further fee will be payable by COMPANY, flat fee or otherwise, regardless of whether sales of additional COMPANY products have been made to the Product member unless the parties agree in writing in advance. A fee shall only be payable for an enrollment for which all necessary information has been provided.  COMPANY may, but is not obligated to, review the validity of the sale of the Product, and may decline any enrollment in its sole discretion.

10.6    COMPANY will maintain records of initial enrollments, rejects and net enrollments in the Products by Customers. Within seventy-five (75) days of the close of each Production Period, COMPANY will provide to Partner reports of such information in a format to which the Parties agree in advance.

Section 11.    Non-Exclusivity. Nothing in this Agreement will be construed to prohibit COMPANY from offering the Products to any other organization or to the general public outside of this Agreement.

Section 12.    Term and Termination.

12.1    This Agreement will begin on the Effective Date and will continue for an initial term of one (1) year.  Unless sooner terminated pursuant to the terms stated below, this Agreement will automatically renew for subsequent periods of one (1) year each.

12.2    In the event that in any single month the ratio of the number of chargeback transactions-to-total sales transactions for the respective month's transactions for PARTNER enrollments exceeds 1% in any month, COMPANY will notify PARTNER in writing of the excessive chargeback rate.  If the ratio of chargeback transactions-to-total sales transactions for PARTNER enrollments exceeds 1% in the month immediately following the month for which COMPANY notified PARTNER of the excessive chargeback rate, COMPANY may immediately terminate this Agreement upon not less than thirty (30) days prior to Notice to PARTNER.  In addition, during the term of the agreement PARTNER will be responsible for any fees or fines charged to COMPANY solely as a result of PARTNER's excessive chargeback rate.

12.3    Either party may terminate this Agreement without cause at the expiration of the initial or any renewal term upon not less than one-hundred eighty (180) days prior notice to the other party.

12.4    Either party may terminate this Agreement upon notice to the other party if the other party materially breaches this Agreement and fails to cure such breach to the reasonable satisfaction of the non-breaching party within not more than sixty (60)

days after notice of the breach, which notice explains in reasonable detail the basis of the breach claim.

12.5 Company may terminate this Agreement immediately upon notice to Marketing Partner in the event of a material change of control involving Marketing Partner. For purposes of this paragraph, a "change of control" means, with respect to Marketing Partner:

    12.5.1 the sale, lease, transfer or other disposition of all or substantially all of the Marketing Partner's assets;

    12.5.2 Marketing Partner's merger or consolidation with or into a third party with the effect that such third party holds, directly or indirectly, more than fifty percent (50%) of the total voting power on a fully diluted basis entitled to vote in the election of directors of the surviving corporation of such merger or the corporation resulting from such consolidation; and

    12.5.3 any other event that results in a third party holding, directly or indirectly, more than thirty three percent (33%) of the total voting power on a fully diluted basis entitled to vote in the election of directors of the Marketing Partner.

12.6 Either party may terminate this Agreement at any time without advance notice upon the occurrence of a bankruptcy event. A bankruptcy event occurs if:

    12.6.1 the other party suspends or goes out of business, substantially reduces business operations, becomes insolvent or unable to meet its debts as they mature, calls a meeting of its creditors, sends notice of a proposed bulk sale of all or a substantial part of its business, makes any general assignment or trust mortgage for the benefit of its creditors, or commits an act of bankruptcy; or

    12.6.2 any petition is filed by or against the other party initiating a bankruptcy, arrangement, reorganization, or other proceeding under any provision of the U.S. Bankruptcy Code or similar law; or

    12.6.3 a receiver or trustee is appointed for the other party or for any or all of its property.

12.7 In the event the average cancellation rate for Customers enrolled in a Product by PARTNER under this Agreement exceeds eighty percent (80%) on a first year average basis, COMPANY may terminate this Agreement in its sole discretion, without any further obligation for compensation to PARTNER. COMPANY shall remain liable for any compensation earned by PARTNER and not yet paid by COMPANY.

12.8 In the event of termination of this Agreement, COMPANY may, in its sole discretion, without any obligation for any compensation to PARTNER, extend or

renew any Customer's membership in the Products until either the Customer or COMPANY terminates such membership.

12.9  Each Product Exhibit will remain in effect throughout the term of this Agreement unless earlier terminated according to its terms or this Section. COMPANY may terminate any Product Exhibit for any reason at any time upon not less than five (5) business days prior notice to PARTNER. In addition, COMPANY may terminate any Product Exhibit immediately upon notice to PARTNER if COMPANY determines that any regulatory authority is likely to or has deemed the transactions contemplated by or related to the Product Exhibit to be in violation of any applicable law. Termination of one (1) or more Product Exhibit will have no effect on any other Product Exhibit or this Agreement. PARTNER will, promptly upon, but in no event later than two (2) business days after, the termination of any Product Exhibit, discontinue all promotion of the affected Product.

12.10  COMPANY may suspend its involvement in any active or pending promotion by providing PARTNER with its written demand ("Suspension Notice") at least thirty (30) days prior to the suspension date. COMPANY's involvement shall resume upon COMPANY providing a notice to resume ("Resumption Notice") to PARTNER. In such instance, COMPANY shall have no liability for its decision to suspend participation in any promotion.

12.11  COMPANY may terminate this Agreement immediately if any action by PARTNER exposes COMPANY to any criminal or significant civil liability. In such instance, COMPANY shall have no liability for its decision to terminate this Agreement.

12.12  Upon the termination of this Agreement for any reason, (i) the licenses granted to PARTNER in Section 4, above, will terminate, (ii) PARTNER will promptly cease its use of the COMPANY Marks for any purpose whatsoever, and (iii) each party will promptly cease its use of and will return to the other party or destroy all tangible copies of the other party's Confidential Information in its possession or control.

12.13  Partner may terminate this agreement immediately if Company is more than 15 business days late in payment of compensation to Partner.

Section 13.  Confidentiality.

13.1  In the course of negotiation of and carrying out its obligations under this Agreement, each party may have or will disclose to the other certain Confidential Information. Each party will use the other party's Confidential Information only for the limited purpose of and as necessary to carry out its obligations under this Agreement and will not alter, copy, misappropriate, use or misuse, transfer, sell, deliver, or divulge Confidential Information for any other purpose whatsoever. Each party will treat the other party's Confidential Information as the other's trade secrets and will not disclose it to any third party without the other party's prior written consent.

13.2    Each party will disclose Confidential Information only to those of its employees and agents whose duties require access to such information and then only for the purposes contemplated by this Agreement and only if each such employee and agent separately agrees to protect the confidentiality of the Confidential Information on terms at least as restrictive as those set forth in this Agreement.

13.3    Each party's Confidential Information is and will remain its sole property. Neither party obtains any ownership or license interest in any of the other's Confidential Information by virtue of its disclosure under this Agreement. Each party will return to the other or destroy, at the disclosing party's option, all of the other's Confidential Information in its possession or control upon termination of this Agreement or at the other party's request at any other time.

13.4    The parties acknowledge that the harm caused by the wrongful disclosure of Confidential Information will be difficult, if not impossible, to assess on a monetary basis, alone, and that legal damages may not be sufficient compensation for such wrongful disclosure. Therefore, either party may enforce its rights under this Section by equitable means, including, but not limited to, injunctive relief, in addition to any other remedies to which it is otherwise entitled.

13.5    The provisions of this Section will survive termination of this Agreement.

Section 14.    Intellectual Property.  Neither party obtains by virtue of this Agreement any rights in nor will it use any copyright, trademark, service mark, logo, patent or other proprietary designation in which the other party or any of its parents, affiliates, or subsidiaries has any ownership or licensee interest without the other party's prior written consent, except as otherwise expressly provided in this Agreement.

Section 15.    Publicity.  Neither party will make any public announcement or other disclosure regarding the existence or terms of this Agreement without the other party's prior express written consent and approval, which, for disclosures required by law, will not be unreasonably withheld or delayed.

Section 16.    Representations and Warranties.

16.1    PARTNER hereby represents and warrants to COMPANY that:

16.1.1    PARTNER has the full corporate right, power and authority to enter into and to perform the acts required of it under this Agreement;

16.1.2    PARTNER has adequate financial resources to fulfill its obligations under this Agreement and that it will provide COMPANY prompt notice of any circumstance that could reasonably be anticipated to jeopardize its ability to meet its financial obligations under this Agreement;

16.1.3    PARTNER's execution of and performance of its obligations under this Agreement does not violate any agreement to which it is a party or by which it is bound;

16.1.4 to the best of its knowledge, the PARTNER Marks do not infringe, misappropriate or otherwise violate the intellectual property rights of any third party;

16.1.5 PARTNER's disclosure of Customer Information as contemplated in this Agreement is fully compliant with its privacy policy and any federal, state and local laws and regulations governing the privacy of personal information; and it has taken and will take all reasonable actions with respect to its computer systems and software to prevent any material interruption or malfunction in performance of any of its obligations under this Agreement due to such systems' or software's inability to recognize any change of dates, including, but not limited to, before, during and after January 1, 2000;

16.1.6 Marketing Partner's disclosure of Customer Information as contemplated in this Agreement is fully compliant with its privacy policy and any federal, state and local laws and regulations governing the privacy of personal information; and

16.1.7 to the best of its knowledge, PARTNER is in compliance with all laws, regulations, rules and ordinances applicable to the operation of its business.

16.2    COMPANY hereby represents and warrants to PARTNER that:

16.2.1 COMPANY has the full corporate right, power and authority to enter into and to perform the acts required of it under this Agreement;

16.2.2 COMPANY's execution of and performance of its obligations under this Agreement does not and will not violate any agreement to which it is a party or by which it is bound;

16.2.3 to the best of its knowledge, the COMPANY Marks do not infringe, misappropriate or otherwise violate the intellectual property rights of any third party; and

16.2.4 it has taken and will take all reasonable actions with respect to its computer systems and software to prevent any material interruption or malfunction in performance of any of its obligations under this Agreement due to such systems' or software's inability to recognize any change of dates, including, but not limited to, before, during and after January 1, 2000; and

16.2.5 to the best of its knowledge, COMPANY is in compliance with all laws, regulations, rules and ordinances applicable to the marketing or sale of the goods, services or other merchandise offered through the Products.

Section 17.   **INDEMNITY.**

17.1   Each party, as Indemnitor, will indemnify, defend, and hold harmless the other party, its parent and affiliated entities, and each of their officers, directors, employees, agents, and representatives, as Indemnitees, from and against all Claims of every kind and nature, whether groundless or otherwise, asserted by a third party based upon any act or omission related to this Agreement or any breach of any representation or warranty made in this Agreement, alleged or real, of the Indemnitor, its employees, officers, directors, agents or representatives.

17.2   Each Indemnitee will provide the Indemnitor with notice stating the nature and basis of any Claim for which it intends to seek indemnification under this Section not more than five (5) business days after its receipt of notice of such Claim provided according to the requirements delineated in this Agreement; provided, however, that an Indemnitee's failure to provide such timely notice does not foreclose the Indemnitee from its right to indemnification if the Indemnitor is not materially prejudiced by such delay.

17.3   If any claim for indemnification is based upon litigation asserted against the Indemnitee, the Indemnitor may, by notice to the Indemnitee within not more than thirty (30) days after its receipt of notice of the claim for indemnification, elect to assume the defense of any such litigation with counsel reasonably acceptable to the Indemnitee. Notwithstanding the Indemnitor's assumption of the defense of any such litigation, the Indemnitee may participate in the litigation with counsel of its own choosing at its own expense. If the Indemnitor elects not to or otherwise fails to assume the defense of any such litigation, the Indemnitee may proceed to defend such litigation by counsel of its choice and the Indemnitor will reimburse the Indemnitee for all reasonable attorneys fees and expenses for such defense. The Indemnitor may participate in the defense of such litigation at its own expense with counsel of its choice.

17.4   The Indemnitor's election to assume or not assume the defense of any litigation under this Section will not be deemed to be a concession of any obligation to indemnify the Indemnitee for the subject matter of such litigation.

17.5   Each party will provide the other with such assistance as the other reasonably requests to assist the other party in defending any proceeding subject to this Section.

17.6   Each party will provide the other with such assistance as the other reasonably requests to assist the other party in defending any proceeding subject to this Section.

17.7   Neither party will settle an indemnified claim without the consent of the other party, which consent will not be unreasonably withheld or delayed.

17.8   The Indemnitor will be fully subrogated to all rights of the Indemnitee for any claims for any amounts the Indemnitor pays under this Section.

17.9    The provisions of this Section will survive termination of this Agreement.

Section 18.    **Limitation of Damages**. Except for any obligation to pay such damages to third parties under the indemnification obligations contained in Section 17, above, neither party nor any of its affiliates will be liable to the other for any indirect, special, incidental or consequential damages, including, but not limited to, lost profits, arising out of or related to this Agreement or its performance or breach, even if it is advised of the possibility of any such damages.

Section 19.    **Force Majeure**. To the extent permitted by law, in the event that either party fails in whole or in part to fulfill its obligations under this Agreement as a consequence of an act of God, fire, explosion, strike, flood, earthquake, embargo, war, riot, or any other cause reasonably beyond the control of the disabled party, such failure to perform will not be considered a breach of this Agreement during the period of such disability and for a reasonable time thereafter; provided, however, that if such period continues in excess of sixty (60) days, the non-disabled party may terminate this Agreement upon thirty (30) days prior written notice. In the event of any *force majeure* occurrence, as set forth in this Section, the disabled party will use its best efforts to meet its obligations under this Agreement. The disabled party will promptly and in writing advise the other party if it is unable to perform due to a *force majeure* event, the expected duration of such inability to perform, and any developments that appear likely to affect its ability to perform any of its obligations, in whole or in part.

Section 20.    **Books and Records**. Each party will maintain books and records of all activities relevant this Agreement according to standard business practices sufficient to demonstrate its faithful performance of its obligations. Each party will provide the other with access to such books and records during normal business hours at the reviewing party's expense and with not less than five (5) business days prior written notice for purposes of auditing the reviewed party's performance under this Agreement. Each party will preserve all such books and records for a period of not less than two (2) years after the termination of this Agreement, but, in no event, less than any longer period required by law.

Section 21.    **Relationship of the Parties**. The relationship between COMPANY and PARTNER established pursuant to this Agreement is that of independent contractors and neither party will be construed to be the agent or employee of the other. Except as expressly provided in this Agreement, neither party may bind or obligate the other in any manner without the prior written consent of the other.

Section 22.    **Third Party Beneficiaries**. This Agreement has been made for the sole benefit of the named parties and shall not be construed to confer any benefit or rights upon, nor may it be enforced by, any other person, including, but not limited to, any officer, director, employee, stockholder, creditor or customer of either party.

Section 23.    **Governing Law**. This Agreement will be governed in all respects by and construed according to the laws of the State of Illinois without regard to its rules on conflict of laws.

**Section 24.    Entire Agreement.** This Agreement contains the entire agreement of the parties and supersedes any and all previous agreements, whether oral or written, between them with respect to its subject matter.

**Section 25.    Amendment.** This Agreement may not be modified in any manner except in a written instrument executed by both parties which specifically refers to this Agreement and expressly recites the purpose of the modification.

**Section 26.    Assignment.** Neither party may assign this Agreement, in whole or in part to any third party without the other party's prior written consent; provided, however, that COMPANY may delegate or assign any of its obligations under this Agreement to an affiliated entity at its discretion with notice to PARTNER. The terms and conditions of this Agreement will bind and inure to the benefit of each party's respective successors and permitted assigns.

**Section 27.    Waiver.** No failure or delay by either party to exercise and no course of dealing with respect to any right of such party regarding an obligation of the other party will operate as a waiver of any such right unless the waiving party so designates in writing. Any single or partial exercise by either party of any of its rights will not preclude such party from any other exercise of any such right or the exercise of any other right. Any single or partial waiver by either party of any obligation of the other party under this Agreement will constitute a waiver of such obligation only as specified in such waiver and will not constitute a waiver of any other obligation.

**Section 28.    Severability.** If any provision of this Agreement is held to be invalid or unenforceable for any reason, the parties will reform that provision to the extent necessary to enforce it and preserve the parties' original intent, failing which, it will be severed from this Agreement with the balance of this Agreement continuing in full force and effect.

**Section 29.    Notices.** All notices, requests and approvals required by this Agreement will be in writing addressed to the President of each party at the address stated for each on the first page of this Agreement with a duplicate copy addressed to the attention of each party's General Counsel at the same address or to such other person or address as either party designates to the other by notice. All notices will be deemed to have been given either when personally delivered or upon delivery by either registered or certified mail, postage prepaid with return receipt requested, or by a recognized overnight delivery service.

**Section 30.    Headings.** The section headings in this Agreement have been inserted as a matter of convenience in reference, only, and are not intended nor should they be construed to convey any substantive content in interpretation of this Agreement.

**Section 31.    Recitals.** The recitals are intended and should be construed to be a part of this Agreement for all intents and purposes.

**Section 32.    Exhibits.** All exhibits attached to this Agreement, including, but not limited to, the Product Exhibits and all attachments, are incorporated into this Agreement by their reference. In the event that any provision of a Product Exhibit or other attachment to this

Agreement conflicts with any provision in the main body of this Agreement, the provision contained in the main body of this Agreement will prevail.

Section 33.    **Counterparts**. This Agreement may be executed in any number of counterparts, each of which is to be deemed an original and all of which together constitute one and the same instrument.

The parties have executed this Agreement by their duly authorized representatives on the dates reflected below to be effective as of the Effective Date.

Quality Resources, Inc.                          Signature Agency, Inc.

Signature                                        Signature
By:                                              By:   Vincent A. Mottola
        Printed Name                                   Printed Name
Its:                                             Its:  Senior Vice President
        Title                                          Title
Date:                                            Date: January 15, 2003

h:\word\brenda\form agreements\quality resources marketing agreement (club product) 010603
01/06/2003

# PRODUCT EXHIBIT NO. 1

## ENTERTAINMENT CLUB

THIS PRODUCT EXHIBIT is entered into between **Quality Resources, Inc.** ("PARTNER"), and **Signature Agency, Inc.** ("COMPANY"), as of _Jan. 15_, 2003, as an exhibit to and part of the Marketing Agreement between PARTNER and COMPANY, dated ____ _Jan. 15._, 2003, to which this Product Exhibit is attached ("Agreement").

## PRODUCT DESCRIPTION:

The Entertainment Club is a nationwide, membership-based, discount and value-added entertainment club providing free movie rentals and discounts on movie tickets and at theme parks, restaurants and other entertainment merchants.

## MEMBERSHIP FEE:

* $7.99 per month or $89.99 per Year

## FEES:

COMPANY will pay PARTNER compensation of twenty-six dollars ($26.00) per Entertainment Club Net Enrollments (the "Entertainment Club Fee"). Entertainment Club Net Enrollments are defined as all entertainment club Product sales transmitted by PARTNER to COMPANY in a Production Period for which the initial Membership Fee is paid by the Customer to COMPANY.

The Entertainment Club Fee payable by COMPANY to PARTNER for Entertainment Club Net Enrollments generated between the 1st and the 14th day of a calendar month shall be payable by the 31st day of that calendar month. The Entertainment Club Fee payable by COMPANY to PARTNER for Entertainment Club Net Enrollments generated between the 15th and the 31st day of a calendar month shall be payable by the 15th day of the immediately following calendar month. To the extent that COMPANY compensates PARTNER for a new Customer enrolling in the entertainment club Product who does not ultimately become an Entertainment Club Net Enrollment for one billable month, COMPANY will be credited for such transaction on future payments.

## BENEFITS:

Benefits of the Entertainment Club are as delineated in the membership materials, as they may change from time to time.

IN WITNESS WHEREOF, the parties have executed this Product Exhibit on the dates reflected below to be effective as of the day and year first written above.

Quality Resources, Inc.

Signature

By: _____

Printed Name _~Cheryl Morris~_

Its: _____

Title _~President~_

Date: _~1/13/03~_

Signature Agency, Inc.

Signature

By: __Vincent A. Mottola__

Printed Name

Its: __Senior Vice President__

Title

Date: __January 15, 2003__

# PRODUCT EXHIBIT NO. 2

## IDENTITY TRACK™

THIS PRODUCT EXHIBIT is entered into between Quality Resources, Inc. ("PARTNER"), and Signature Agency, Inc. ("Company"), as of __Jan. 15__, 2003, as an exhibit to and part of the Marketing Agreement between PARTNER and Company dated __Jan. 15__ 2003, to which this Product Exhibit is attached ("Agreement").

## PRODUCT DESCRIPTION:

Identity Track offers consumers assistance in protecting their identity and credit by providing a monitoring and alert service through monitoring their credit report with at least one credit bureau, providing a copy of their credit report and quarterly updates, supporting credit card registration and cancellation reporting, and an on-line credit analyzer, among other benefits.

## MEMBERSHIP FEES:

o   $9.99 per Month

## SERVICE FEES:

COMPANY will pay PARTNER compensation of twenty-six dollars ($26.00) per Identity Track Net Enrollments (the "Identity Track Fee"). Identity Track Net Enrollments are defined as all Identity Track Product sales transmitted by PARTNER to COMPANY in a Production Period for which the initial Membership Fee is paid by the Customer to COMPANY.

The Identity Track Fee payable by COMPANY to PARTNER for Identity Track Net Enrollments generated between the 1st and the 14th day of a calendar month shall be payable by the 31st day of that calendar month. The Identity Track Net Enrollments generated between the 15th and the 31st day of a calendar month shall be payable by the 15th day of the immediately following calendar month. To the extent that COMPANY compensates PARTNER for a new Customer enrolling in the Identity Track Product who does not ultimately become an Identity Track Net Enrollment for one billable month, COMPANY will be credited for such transaction on future payments.

## BENEFITS:

Benefits are as delineated in the membership materials as they may change from time to time.

The parties have executed this Product Exhibit by their duly authorized representatives on the dates reflected below to be effective as of the date reflected in the preamble to this Product Exhibit, above.

Quality Resources, Inc.

Signature

By: _____
    Printed Name

Its: _____
     Title

Date: _____

Signature Agency, Inc.

Signature

By: Vincent A. Mottola
    Printed Name

Its: Senior Vice President
     Title

Date: January 15, 2003